Good morning. May it please the Court, my name is Cameron Schlegel and I am pro bono Amicus Curia counsel in support of Appellant David Scott Peasley. I would like to reserve two minutes for rebuttal. Okay, watch your clock. This case presents a straightforward question. Did the District Court err in granting summary judgment to Appellees Gibson, Orozco, and Lopez on Peasley's 8th Amendment claim that they were deliberately indifferent to his serious medical needs as a diabetic prisoner? The answer is yes. Before addressing the merits, I will briefly address the District Court's denial of Peasley's request to have counsel appointed because at the very least this provides context for discussing the evidence in support of Count 6. The District Court abused its discretion by twice denying Peasley's request to appoint counsel. Peasley was previously appointed counsel in the District Court and in the ensuing appeal to this court and those orders presumably carry with them findings that Peasley's case was exceptional. Nevertheless, after remand, the newly assigned District Judge denied Peasley's request to have counsel appointed. Given the complexity of the legal and factual issues involved and the very complex procedural history, the assistance of was necessary to ensure a fair presentation of Peasley's claims. The denial of counsel significantly prejudiced Peasley's ability to effectively oppose summary judgment and present his case. This abuse of discretion is an independent ground for reversal, but it also provides context for the District Court's conclusion that Peasley failed to demonstrate the existence of a tribal issue. In their motion for summary judgment, Appellees relied almost exclusively on the evidence that they submitted months previously with their prior motion. Peasley, by contrast, did not submit or reference any of the evidence that his prior counsel submitted in opposition to Appellee's original motion. Peasley's handwritten opposition and the evidence he submitted reflect that he did not understand all of the relevant issues, nor does it appear that he was aware of some of the previously submitted evidence. Appellee's reliance on evidence from their prior motion should have alerted the District Court to consider the evidence that Peasley had previously submitted when he was represented by counsel, but it is unclear, if not doubtful, that the District Court considered any of that evidence. Turning to the merits of Count 6, the District Court misapplied the legal standard and failed to consider crucial evidence demonstrating that Peasley faced a substantial risk of serious harm on September 7th and 9th, 2013, and that Appellee's disregarded that risk. First, the District Court failed to view the evidence in the light most favorable to Peasley, seemingly requiring him to produce expert evidence and show that he suffered actual harm. At the summary judgment stage, the court was required to draw all reasonable inferences in Peasley's favor. But the District Court instead drew multiple inferences against Peasley. Kennedy. Counsel, could you distinguish Gibson and Orozco from Lopez? Do you think that would be a good idea? O'Connor. In what sense, Your Honor? Kennedy. The facts were different, weren't they? O'Connor. Somewhat. I think that the — they're — Kennedy. I mean, the facts are important. You haven't discussed the facts yet. Discuss the facts. O'Connor. So, more precisely, it seems to be undisputed that Peasley asked Officer Gibson for a blood test as a precaution. And that, as a precaution, doesn't necessarily alert Orozco and Gibson that Peasley needed that test right now, whereas for Lopez, Peasley told Lopez that it was urgent, his condition was urgent, and he needed — and he was demonstrating symptoms. So it seems to me that these two different incidences might give rise to different levels of potential liability at the least. O'Connor. Your Honor, so I think — I think that the — there's a distinction with exactly what Peasley told Officer Lopez. And I think that his request to Officer Lopez was significantly more in line, for example, with what this Court addressed in the first Peasley case or in Lawley saying that there was actually an emergency. However — Ginsburg. Doesn't it — doesn't it make a difference to the legal standard of deliberate indifference, like, what they were aware of and that they, you know, disregarded? Because that is the legal standard, and applying it to the facts as alleged by Peasley, you know, in the light most favorable for Peasley, he did say, as a precaution, to Gibson and Orozco. I mean — and — and Lopez, I guess he said it was urgent, and then he kind of debated, and then he left Peasley, and just all he gave him was a form. So he seems far more culpable under that standard, to me at least. O'Connor. I think — I read — I read Farmer and this Court's precedents. Farmer specifically says that the standard is whether the appellee is new of and disregard a substantial risk to future health. And I think in this instance, when Peasley said that he was requesting the blood test out of fear of potential seizures, coupled with their knowledge of the fact that Peasley is a brittle diabetic with — with very unstable diabetes, that it actually supports the finding on the subjective prong of the deliberate indifference test. But were Gibson and Orozco aware of the seriousness of Peasley's — Were sufficiently aware, and at the very least, Peasley had stated that there is apparently a sign on his cell that says that he's a diabetic that — that receives treatment a few times a day. I don't know if the scheduled test — that was — that testimony was given, I believe, in relation to a prior incident in July. But I believe the record shows that they were aware that he was a diabetic and received treatment multiple times a day, close to mealtime. But Mr. Peasley's expert also — also said that — or explained how important blood tests are, including routine blood tests. So I think, you know, in — in society, most people have constant blood sugar monitors. Diabetics have constant blood sugar monitors, and Peasley's expert explained the purpose of that, that — that you can't necessarily evaluate the risk of high or low blood sugar just based on mealtime insulin regimens. And so I think, again, that — that Peasley saying that he was — he needed this as a precaution for potential seizures, coupled with their knowledge of his very unstable diabetes, at least puts them on knowledge of what pharma requires, which is a substantial risk to Peasley's future health. And then I think, you know, assessing what they did in — in response to that, I would submit that the — the record shows that — that Gibson contacted, first, the pill line nurse, who, just as I understand it, administers medications that have already been ordered by doctors. And with respect to — to that incident, I think that making a futile request — or a request that custody officers know is futile and is not going to result in a doctor evaluating whether a further blood test or treatment is necessary. So, for instance, if a doctor had looked at Mr. Peasley's medical records, they presumably would have seen, based on what Mr. Peasley submitted in his declaration, that his blood sugar had been very aggressively high early on in the day on September 7th. And perhaps that would have — I'm not a — I'm not a doctor, but perhaps that would have made a difference as to what they evaluated in — in determining whether or not to administer care. But I think it's important — Could I interrupt you for just a second? Yes. Mr. Counsel, your Exhibit A, the Plaintiff's Declaration of Facts in Support of Opposition to the Defendant's Motion for Summary Judgment, is the medical services operational procedures which apply in this location. And on the lower right-hand page, it says, all patients requesting urgent-slash-emergent medical attention will be triaged based on medical need. The staff member shall call the appropriate facility clinical area. Mr. Peasley said that he'd had a 500 reading on his blood test earlier, and he was concerned — he was a precaution against seizure — that he'd like to have another blood test. That wasn't an emergency request, as he made later to Lopez. If the standard is indifference rather than negligence, isn't there a difference between those two? In my view, Your Honor, no, because of the futility of the requests that — that they made, and given the serious nature of leaving diabetes untreated. But you're assuming that all treatment for diabetes is serious, is emergent. That's not so. Well, I think taking the converse, Your Honor, if that were the standard in the Eighth Amendment evaluating whether or not officers who have knowledge of a serious risk to future health, as Farmer said, then it would imply that the future harm must come to fruition before officers can be held liable under the Eighth Amendment. You have a difference between an emergency request and a precautionary request. Isn't that a difference? Perhaps in the policies, but Ortiz, the Seventh Circuit case, Ortiz addressed that the policy is not at issue in this case, but if the argument is that the officers were just following the policy, I think the question becomes whether even under the subjective prong, and given the reasonableness of their actions, whether it was reasonable knowing that there's a substantial risk of future harm to Mr. — to Mr. Peasley, just being — if he's left untreated and doesn't eat the appropriate amount of food at dinner, then — I understand your answer. Okay. But wasn't it Peasley himself who used the word precaution? That isn't the characterization by the officers. I mean, it was Peasley himself. At least he claims, I want a blood test as a, quote-unquote, precaution. And when you use that word, it's not — it means it's not urgent by definition. Yes, Your Honor, I think it's correct that that's the word that Mr. Peasley used. However, I still think that custody officers have a responsibility in light of known circumstances. Mr. Peasley is a prisoner and not a medical professional. I think the question is, what level of care must they provide, especially — I mean, the precaution was coupled with his statement about potential seizures. And although it's unclear whether — whether Mr. Peasley had told the officers at the time he was requesting care what symptoms he was experiencing or what his blood sugar had been higher in the day, I think that there's support in the case law that — I go back to the futility of the officers' contact to the pill — to the pill line nurses. They were — they were simply told that Peasley did not have an appointment to — or was — didn't have a doctor's order to receive a blood test at that time. I think that if we're — if we're looking at a standard just for custody officers to follow making a futile request — in other words, had Officer Gibson contacted the medical unit and a physician in the medical unit and said that I have an inmate who has — who's known to have very aggressive diabetes, is on a treatment regimen, and is saying that he's concerned about his blood sugar this evening, and the doctor, in turn, looked at Peasley's medical records and made a decision not to allow Mr. Peasley to take a blood test or to administer insulin, then perhaps you have a different claim under those facts, and the claim might be against the medical unit staff, which is a bit of a different standard than custody staff. So for custody staff, I think the question is whether the actions they take to abate a known substantial risk of future harm to an inmate's health based on a serious medical condition — It wasn't a substantial risk except in the mind of Peasley, and it was a precaution. He might have a seizure. Is there a difference between might and will? There is, Your Honor. I would submit that, as Lawley found, based on — and actually, Lawley, this was criticized by Judge O'Scanlan in his concurring in part and dissenting in part opinion, but Lawley explained that there are well-known circumstances with diabetes, which was part of the core finding of that, that if left untreated even for a short period of time, there can be very severe complications. So I would submit that that is well-established, which is why perhaps these circumstances present a different issue in focusing on the futility of the actions that were taken as opposed to whether or not there actually was an emergency. There's no case, at least that I've read, that suggests that an emergency must be occurring before staff are required to administer medical care. It's knowledge of a serious risk to future health, as Framer framed it. And I think here, the futility of the officer's actions is important. And if I may just say, there's also a dispute in the record with Officer Gibson. Officer Gibson claimed to have, and I think this goes to what Mr. Peasley's burden of proof was, which was just to show a dispute of fact, Officer Gibson claimed to have reached out to a so-called patio nurse, which I'm not sure is part of the medical unit or not. And I'm mindful of my time, and I'll rest on this point. But Officer Gibson was asked why that second call was not in her chrono. And her explanation for that was that she could not understand the patio nurse's name over the phone, and therefore just didn't include it in the chrono. But I think that a reasonable trier of fact could look at that and look at the discrepancy between the chrono and the claim that she called a nurse, even assuming it was with the medical unit, who also said that they would not be able to see Peasley at that time, whether that was compliance with the guidelines or compliance with the Eighth Amendment standard. Thank you. Thank you, Your Honors. Good morning, Your Honors. May it please the Court, Michael Quinn, Counsel for Defendants and Appellees Lopez, Orozco, and Gibson. The District Court's decision should be affirmed for three reasons. First, there's no evidence that either Defendants Gibson and Orozco or Lopez were deliberately indifferent to Peasley's medical needs during their interactions in September 2013. In addition, even if this Court finds that the defendants violated his rights, they are entitled to qualified immunity. Counsel, I understand you're arguing that here, but that was not an issue before the District Court. And the District Court did not rule on that issue. So I'm not sure it's properly before us. Correct. We do have in our brief a citation to the Bibu, I'm not sure how to pronounce the Bibu case, in which this Court can affirm even if qualified immunity is not addressed in the District Court case for the purpose of basic judicial efficiency and economy, that the Court can affirm the District Court's decision on qualified immunity grounds, even if qualified immunity is not addressed by the District Court. Well, we don't usually do that. So. There is some case law out there that we cited in our brief to that effect. Okay. In addition, with regard to the denial of the request for counsel by the District Court, that was appropriate as there were no exceptional circumstances that would require the appointment of counsel in this case. Moving just to Gibson, to begin with, Gibson contacted an LVN on September 7, 2013, and. Do you want to tell me what those three letters mean? A licensed vocational nurse. Okay. And so she contacts the licensed vocational nurse initially on September 7, when Peasley says he needs a blood test. That nurse says, don't send him out here, he'll be sent right back, he doesn't have an appointment. And Peasley continues to complain or to request attention, medical attention. So she contacts a second nurse who says basically the same thing. Don't send him here, he's going to be sent back. There was no, through those contacts with the nurses, they demonstrate that Gibson, there was no conscious disregard on the part of Gibson with regard to Peasley's medical needs. She knew he was a diabetic. She tried to get him assistance and medical declined to, as they are required to, they prioritized treatment. The staff reaches out for direction, she reached out for direction, and they decided, they declined to treat him that night. With regard to Lopez, there was similar conduct by Lopez, appropriate conduct by Lopez. She was, Peasley informs him, informs her, sorry, that he has an urgent situation but he needs a pass. Lopez then turns to, goes to the phone, calls somebody in medical and returns to Peasley saying you don't have an appointment. Here is a request form, a medical request form. And that, again, is consistent with the guidelines that correctional staff are required to follow. At one point, the counsel for appellants stated that Peasley is a prisoner, he's not a medical professional. Well, Lopez is a correctional officer. She's not a medical professional. She is dependent on the medical professionals at the prison to give her direction and to prioritize the treatment for any inmate, including Peasley. If I could interrupt, if it's an urgent medical situation, the normal procedure is to give the prisoner a medical form? That doesn't seem right. No, as Gibson stated in her deposition, if there's a need for emergency care, you can contact medical staff over the radio, you can have them respond to the housing unit. If someone is in some sort of distress, as the inmate was in the Lawley case, where he had an obviously sickly appearance, he was making explicit statements, there was extreme behavior health-wise for that particular inmate. That is not this case. Peasley says he needs a pass. A pass is not an emergency item. It just gets you out of the housing unit to go to it. But why did he say he needed a pass? Didn't he say it was an emergency? He said it was urgent.  Oh, pardon me. He only said it was urgent, not emergency. I mean, if you look at page 173 of the record, in Peasley's own words, he says it's urgent. But then again, he says he needs a pass. Now, let me read to you the Medical Services Operational Procedure. All patients requesting urgent slash emergent medical care will be triaged based on medical need. So it's not really important whether he said it was an emergency, if he did say it was  Correct?  But what you've read reinforces the fact that the correctional staff are dependent on the medical staff to provide treatment and to... It said triaged by the medical, but not by the custodial. He didn't...  He just gave him a form. He didn't talk to the medical people, did he? Lopez first turned to, made a phone call and returned and said to Peasley, you don't have an appointment. Who did Lopez call? Presumably someone in the medical staff. All he told him was that Lopez felt bad. He didn't tell them that Lopez said he needed urgent medical care. Well, what he says on page 173 is, upon her return, she, Lopez, said, you, quote, don't have an appointment, close quote. Okay, but when you have an urgent need for care, why do you need an appointment? Well, he said it was urgent, but beyond that, there's no evidence that anything...  He was showing symptoms as well. But there's no evidence that those symptoms that he mentioned, any of those, like the blood sugar, the 500 level blood sugar, there's no mention, there's no evidence that that was communicated to Lopez. It's in the... He refers to it, you know, he woke up feeling bad, his sugar level was over 500. There's no account by Peasley which indicates that that was communicated to Lopez. There's no, and there's no evidence that he was, he had a sickly appearance as the inmate in Lolly. There's no evidence that he was engaging in extreme behavior. And furthermore, if you look at the plaintiff's own expert, we have the plaintiff's expert report in our supplemental excerpt's record. He doesn't mention anything about this period, September 2013, of any emergency or any urgent issue that Peasley had medically. He's silent on the matter. Furthermore, the request form that Lopez provided him was filled out by Peasley the following day, and it refers to the need for treatment for a rash. It's not even related to his diabetes, the request for treatment. And that's on page 43 of the excerpt's record. It's in his own hand. So all of this provides context that, you know, even though he's stating it's urgent, he then makes a specific request for a pass. That's not something that is... The pass, what does the pass do? My understanding, it gets you, if you have an appointment, it gets you out of your housing unit and you can go to the appointment in the medical area or wherever the nurse or the doctor is located. But the pass is just to move from point A to point B, from your housing unit to a medical area. So the need for urgent medical attention, and he wanted a pass to get to the medical center. And Lopez reacts to that, and he calls medical to see if he has an appointment, because that's why he would need a pass. And medical, again, they provide direction. They decide the priority of the treatment, and they concluded that he didn't have an  So Lopez does the next best thing, provides him with a form so that he can get medical care. And there was no, there is no evidence, again, of any sickly appearance on the part of Peasley. There's nothing to alert Lopez, someone who's not a medical professional, there's nothing to alert her to the fact that he's in any distress. And if you look at the other evidence in the case, there's no evidence that he was in  Right now we're taking the evidence in the light most favorable to Peasley, right? Correct. And he says he was showing symptoms. He says that in his account, but he doesn't say that he communicated that to Lopez. The 500 level, blood sugar level that he references in his, on page 173, that is never, he never states they communicated that to Lopez. He never states that he communicated that his eyes were burning and he felt, felt dry, or that he felt sluggish and drained. And he wavered to sit down in the presence of Lopez. That's the sentence, there's, again, reading the, the, that, that account from, from Peasley, there's no indication that Lopez was in the presence of, of, of Peasley when he went from a standing position to a seated position. That does, it wasn't clear from the record because the deposition transcripts, I think, skip pages, but did Officer Lopez say that she was told that it was urgent or did she say she denies it or it's unclear? She, there's a confusing interaction during her deposition where she was confused initially about what the, what question was being asked by Peasley's counsel. But if you go to page 181 of the record, 182, she eventually acknowledges that she has no reason to believe that this didn't occur. So there's no dispute about whether it occurred. This was, she doesn't recall the interaction. So for, with regard to the Lopez, the facts regarding September 9, 2013, this interaction between Lopez and Peasley, primarily we're, we rely on page 173 of the record, that's Peasley's own account, because Lopez has no independent recollection of this interaction. I'm looking, unfortunately, it goes 181, 3181 is page 51 from the deposition transcript. 182 is page 59 of the deposition transcript. So we're missing eight pages. So it's not clear from the record exactly what she. Sorry, I misspoke. The, if you go to. You're right, 181 does refer the beginning of it, but then whatever clarification is missing. Well, I think the key part is, volume three, page 181 of the record, line 11 through 18, where Peasley's counsel says, so do you have any reason to doubt whether or not Mr. Peasley informed you of his need for a medical pass on September 9, 2013? And there's an objection there. But then the witness, Lopez, responds, no. She has no reason to doubt that this occurred. There's, you know, 300 some odd inmates in the housing unit where Lopez worked. So it's kind of just another day at the office, in a way, for Lopez dealing with inmates. So there's nothing that reminds, she has no, again, independent recollection of this. But she says in her depo there's no reason to believe it didn't occur. And again, just, I think. Is there, sorry, interrupt. Is there anything in the record that says what she did after he told her that it was urgent? Did she ask any follow-up questions? Well, on page 173, this is, again, Peasley's on account. She goes, she calls medical. She's told he doesn't have an appointment. So she does the next best thing, which is provide him with a form that will allow him to see medical. And he indeed did see medical the following day. Yeah, but you're implying that because you said earlier that he didn't tell her that he was feeling dizzy, et cetera, she, I think you're kind of suggesting she didn't believe him that it was urgent? I mean, what was her, if someone says. I don't think there's any, sorry, go ahead. Yeah, if someone says this is an urgent medical situation, you know, I think you probably should accept that at face value unless there's some other information that the person's fibbing or you ask and figure out what it is and it says, I have a stubbed toe. Okay, that's not an urgent medical situation. But I mean, you're implying that she somehow had a basis for discounting his claim that it was an urgent medical care. So I'm trying to figure out what's in the record that suggests that she had a basis to discount it. There's, first, there's no evidence that he had any sort of sickly appearance or was in any distress. So he wavered. He wavered and had to sit down. Again, there's no evidence that that occurred. It was clearly, as Judge Friedland wrote in the prior appeal, she was clearly aware that he was diabetic and when he was asking for urgent care that she could have easily interpreted knowing that he had a serious medical condition as a serious medical need, which is the standard. I see my time. My time has expired. If I could just briefly answer. You didn't briefly answer the question, of course. He did say it's an urgent need, but he also said, I need a pass. He made a very specific request and at that point, Lopez responded to that request. But are they automatons? I mean, they're not human beings. They don't understand when he's saying a pass and he wants to go to the doctor. You have to use magic words? You have to. She is not a medical professional. Her job is to, when someone needs medical care and they don't appear to be in any distress, as Peasley did not appear to be. Just a minute. She reported, Lopez made a phone call and told medical staff that plaintiff, quote, felt bad, unquote. Now, if she made that statement, she had to have the opportunity to observe Mr. Peasley. Again, she's not a medical professional, so. No, but she made the, she said he feels bad. Doesn't that indicate that she appreciated the distress he was under? Correct. And that's what a correctional staff is required to do. She did not consciously disregard or ignore his needs. She contacted medical and if medical had said, send him out here, she would have done so. But she can't do that unless medical gives her the green light. All right. Thank you, counsel. Thank you. You are over your time, Mr. Schlager, but I will give you a couple minutes to respond. Thank you, Your Honor. I'll try to be quick. So this issue of needing the green light from medical, perhaps I'm just misreading farmer too literally, but substantial risk to future health. And I'm sympathetic to custody staff and that they have a lot of demands from inmates. So I think the reasonable question then is, what must they do when somebody tells them that there's an urgent need for care? Who must they contact? Officer Gibson and Lopez both testified that they didn't perceive an emergency, which is why they didn't elevate the call higher. I don't think that that's the standard as I read it. The potential for an emergency is enough. And as my colleague has said, they're not doctors. So doctors should be charged with deciding whether, you know, with, as Judge Baez said, with triaging an inmate to determine whether or not there's an emergency. I think particularly with the diabetic inmate like Mr. Peasley, there is kind of an inherent circumstance there of the potential for a severe emergency if something is left untreated. So it should be directed to staff that can actually do something about it. It also begs the question of, and I think this goes to whether there's a genuine dispute, what was communicated to the medical staff? So if Officer Gibson, for instance, just asked, is Mr. Peasley on the list to receive a blood test at this time? That wouldn't have communicated whether there was anything about, whether she mentioned anything about his fear of potential seizures. And she, Officer Gibson testified that she couldn't recall whether she said anything to medical staff about his fear of potential seizures. Likewise, Officer Lopez, if she didn't communicate the urgency to whatever medical staff she spoke to, which we don't know in the record what medical staff she spoke to, then that might have changed the circumstances. So I think the substance of the communication is also important in evaluating whether or not the officers took reasonable actions to obtain care. But the last thing I would just note is there is a discrepancy in the record. Judge Lee, as you noted with Officer Gibson's, or excuse me, Officer Lopez's deposition testimony, that was the excerpts of the deposition that were submitted with an opposition to the prior motion for summary judgment. So I didn't have access to the full transcript. All right. Thank you very much. I want to thank Mr. Schlegel and Snell and Wilmer for the pro bono representation today. Thank you very much. And Peasley v. Spearman will be submitted and will take up Gelber v. City of Willets.
judges: WARDLAW, BEA, LEE